MARK ROSENBUSH (CSB #72436)
Attorney at Law
214 Duboce Avenue
San Francisco, CA 94103
Tel: 415-861-3555
Fax: 415-255-8631

Attorney for Defendant
ALLAN GREEN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | No. CR-05-00208-CRB |
|---|---|---|
| Plaintiff, | ) | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | ) | |
| VNCI Inc., et al (Allan Green) | ) | Date: April 9, 2008 |
| | ) | Time: 2:15 p.m. |
| Defendant. | ) | Court: Hon Charles R. Breyer |

Defendant Allan Green entered a plea of guilty to one count of conspiracy to commit fraud in relation to the E-Rate application of the Philadelphia Academy Charter School. Mr. Green submits the Court should sentence him to a term of probation, with a term of home detention or community confinement, based on, among other factors, Mr. Green's minor role in the offense, the absence of any actual monetary loss as a result of Mr. Green's offenses, and Mr. Green's cooperation.

Mr. Green submits that an appropriate sentence in his case is a term of three years probation with the condition that Mr. Green serve 60 days in a community confinement facility followed by 180 days in home detention.

I.   THE OFFENSE CONDUCT.

Judy and Allan Green, now both in their 60's, were both career public school system employees. Both had long careers in public education and neither had any criminal history

*GREEN: Sentencing Memo*                   1

whatever prior to this case.  Judy Green worked as a public school teacher for 18 years in New York City, followed by 15 years in Los Angeles.  Allan Green worked as a high school math and science teacher, counselor and finally as an assistant principal with the L.A. Unified School District for 16 years, from February, 1985, to July, 2001 when he retired.

Judy Green became involved in the E-Rate and related computer technology programs while she was working for the L.A. Unified School District.  She garnered both technical expertise with respect to computer networking, and expertise with the Federal E-Rate program while still a school district employee.  Towards the end of her career with LAUSD she began consulting with other school districts to assist them with their E-Rate applications.  In approximately 1998 she incorporated ADJ, Inc., as a consulting firm under which she operated her consulting business.  ADJ was initially incorporated with Allan as an officer simply because officers must be named for incorporation.  He played no active role in the company whatever, since he was a full-time employee of LAUSD.  After ADJ was incorporated Judy traveled frequently on her consulting business and Allen was rarely with her because of his job with LAUSD.

Initially Judy conducted her consulting business while working at LAUSD.  She left LAUSD in 1999 and she worked for VNCI, Inc., from 1999 to August 2001.  Most of the offenses for which she has been convicted occurred from this point on.  Allan Green had no involvement with VNCI whatever.  To him VNCI was simply the firm that his wife was working (and traveling frequently) for .  After Judy left VNCI she resumed using ADJ as the vehicle for her consulting work.

After he retired in 2001 Mr. Green had nothing to do, so he began to travel with Judy to keep her company and assist in relatively menial ways with her consulting business.  Judy possessed a great deal of expertise concerning the very complex and bureaucratic E-Rate application process.  Allan, in contrast, knew next to nothing about the E-Rate application process.  He also knew nothing whatever about computer network technology.  His work for his and his wife's company, ADJ Consulting, consisted of acting as his wife's assistant.  As the Presentence Report notes, "Witnesses fairly uniformly described Allan Green as Judy Green's

'secretary' or 'puppet.' He largely sat quietly by her side at meetings and responded to her every beck and call, including carrying her bags and getting lunch. ..." PSR at ¶ 20  By that time, Judy Green had already been working for a long time as an E-Rate consultant, and she and the other charged conspirators such as George Marchelos had been running their E-Rate business for several years.[1]

Judy Green was the driving force behind ADJ, and behind the E-Rate business at VNCI. Allan became involved with his wife's business only after his retirement, at the very end of the charged offenses. The acts charged in the indictment occurred basically between 1998 and 2003. Allan Green plead guilty to a conspiracy to defraud which took place basically in the last few months of 2002 and the first few months of 2003. As Allan Green's Presentence Report notes, "Judy Green functioned as an intermediary between prospective competing vendors in a 'hub-and-spoke' bid-rigging conspiracy. She was at the center of the conspiracies, acting to coordinate the vendors' bids, and she was the key decision maker as to which vendor would receive which portion of the project" PSR at ¶ 13. Allan had no knowledge whatever of the application and bidding requirements of the E-Rate program, or the technical distinctions between eligible and ineligible products. He never advised any school districts about E-Rate or technology. During the last year to year and a half of the charged conspiracies he traveled with his wife and assisted her primarily with administrative matters such as note-taking, mailing, errands, etc.

As the court will recall, Judy Green submitted a sworn declaration in support of Allan Green's motion to sever. In her declaration, Judy Green described her husband's role in the fraudulent scheme she directed:

> Though Allan accompanied me to many meetings at which E-Rate information was disseminated, Allan did not play a significant role in the E-Rate business. Instead, Allan acted essentially as my administrative assistant on these matters. Allan simply did not possess the technical expertise and background in the E-Rate program that I possessed, and which was required to operate the E-Rate consulting business I ran....

---

[1] Mr. Green was initially charged in only the last 2 of the 22 counts in the original Indictment in this case. Those counts will be dismissed upon his sentencing for his role only in the Philadelphia Academy application.

*GREEN: Sentencing Memo*                             3

> In 1998 I formed the company ADJ Consultants, Inc. along with Michael Kurz. Though Allan's name was eventually placed on the company charter as an owner and president, Allan's position in the company was merely titular. In fact, Allan's role at ADJ was to be my administrative assistant. I made all of the strategic and substantive business decisions concerning the day-to-day operation of ADJ. Allan did not even begin doing any work at ADJ until he retired from the L.A. Unified School District in 2001.
>
> In the time we owned the ADJ business, Allan never provided any substantive assistance with the preparation of E-Rate program applications, budgets, application attachments, technology plans, or any other documents or business proposals attendant to the E-Rate subsidy application process....I also sometimes directed Allan to send materials and notes to school districts and vendors when I was not in the office and Allan was.

Specifically in regard to the Philadelphia Academy E-Rate applications, Mrs. Green admitted in her declaration, "I directed Allan to deliver ... letter[s] to Philadelphia Academy. Allan's only role was to act as a messenger, hand delivering documents I prepared for the Philadelphia Academy. Allan did not play any substantive role in preparing the documents, or the Philadelphia Academy's 471 applications and proposed budgets."

In the fall of 2002 Allan Green traveled by himself to the Philadelphia Academy at Judy Green's request. This was a highly unusual activity for him relative to Judy's E-Rate business. Judy was too busy soliciting business and preparing applications for E-Rate Year 6 to travel in order to personally meet with all of the school districts that she was soliciting business from. She sent Allan Green to make initial contacts with Philadelphia Academy, after which she took over all substantive work on that application.

Though it might seem that Judy Green's statements indicating her husband played a very minor role in her offenses should be viewed with caution, her statements are corroborated by the statements and testimony of numerous government witnesses regarding Allan's role in Judy's consulting business, including the following.

A.   <u>Witness Brien Gardiner</u>

In April of 2005, when interviewed by attorneys from the Department of Justice, Brien Gardiner, the chief administrator of Philadelphia Academy Charter School, said that Allan Green

> said his wife was very knowledgeable about the [E-Rate] program and able to help them fill out the necessary forms. Mr. Green mentioned to Brien Gardiner and Kevin O'Shea that Mrs. Green traveled from school to school helping fill out the E-Rate forms. Kevin O'Shea asked Mr. Green for the name of the company his wife worked for. Mr. Green told Kevin O'Shea that he did not know the name of

*GREEN: Sentencing Memo*                4

her company. . . . Mr. Green then called his wife to find out the name of her company.

The reason Mr. Green was not sure which company he was representing was that Judy Green was acting variously on behalf of several "foundations", and on behalf of ADJ, with respect to different school districts

Mr. Gardiner also testified at Judy Green's trial. During the course of his testimony, Mr. Gardiner noted that Allan Green "set up" the first, introductory meeting between ADJ and the Philadelphia Academy staff. However, Mr. Gardiner noted that after the initial meeting was arranged by Allan Green, Judy Green took control of the Philadelphia Academy's E-Rate application. According to Mr. Gardiner, "Mrs. Green indicated she could help us do that and pretty much do it from inception, from beginning to end, the whole process."

Concerning the Philadelphia Academy's E-Rate application and co-pay, Mr. Gardiner testified (at Judy Green's trial) to the following:

Q. You mentioned that Ms. Green said she was going to help with your e-rate process?

A. That's correct.

Q. What e-rate funding year was this for?

A. The best of my recollection it was year six.

Q. Just for the jury's reference, this is one of the projects charged in counts 21 and 22 of the indictment. What did Ms. Green say about her role in the application process for e-rate?

A. She was going to help us get some foundation funding to cover the part that wasn't funded by e-rate.

Q. So let's spell that out a little bit. What is your understanding regarding typically under the e-rate program how much a school like yours would have to pay?

A. Somewhere in the neighborhood of 20 percent.

Q. What did Ms. Green say to you at this meeting about your obligation to pay that 20 percent?

A. She indicated that she had people who are anxious to donate money that would provide for that percentage that we would be responsible for.

Q. Did she say -- did she refer to any organization that would be making that donation to the school?

*GREEN: Sentencing Memo*             5

    A. Again, to the best of my recollection, it was something like the American Education Alliance or foundation.

    Q. Aside from this issue related to the foundation and covering your copay share, did Ms. Green say anything about her role in the e-rate application process, the paperwork process?

    A. Again, to the best of my recollection, the conversations surrounded the fact that everything would be done; we wouldn't have to do anything.

    Q. Everything would be done by whom?

    A. The paperwork would be done.

    Q. By whom?

    A. By the organization. I'm not sure which individual would do it, but by the organization.

    Q. When you say "the organization," who are you referring to?

    A. It was Mrs. Green and her husband's -- her husband's company, I guess, was the people that were going to do the work.

The "company" to which Mr. Gardiner referred, the company that Mr. Gardiner understood would handle Philadelphia Academy's E-Rate applications, was ADJ Consulting. Mr. Green submits that given the statements of the other government witnesses in this case, it is evident that Allan Green did not perform any substantive work on the E-Rate applications handled by ADJ and Judy Green.[2]

    B.    <u>Government Witness Richard Favara</u>

In June of 2003 Mr. Favara told the F.B.I. that Judy Green "was instrumental in helping schools obtain E-Rate funding," and that Judy Green, "used a computer company called Excalibur . . . to put T-1 lines in school districts. Mr. Favara further indicated Judy Green got Expedition networks (Mr. Favara's company) involved in the Lee County School District E-Rate application, and that it was also Mrs. Green who spoke with him about Expedition refunding some money to the school districts in order to fund the districts' co-pay requirement. In a lengthy interview in June of 2003, Mr. Favara's only description of Allan Green participating in the E-Rate program consulting business was: "GREEN and her husband, ALAN GREEN (ALAN), had

---

[2] In his debriefings, cooperating witness George Marchelos described Ms. Green as a "control freak" who insisted on personally reviewing all matters related to the subject E-Rate applications.

1  contacted school districts with regard to E-Rate ...". All of his detailed statements regarding the
2  E-Rate consulting business detailed Judy's activities.
3       During his December 2004 interview, Mr. Favara told the F.B.I. and D.O.J. attorneys that
4  he was referred to Judy Green by Steve Newton, and that Mrs. Green represented herself to be an
5  expert on E-Rate. Mr. Favara did not indicate Allan Green possessed any such expertise.
6  Moreover, according to Mr., Favara, when he met with the Greens, "[Judy] GREEN did all the
7  talking and ALAN would pull out documents." This description of Allan Green acting as Judy
8  Green's assistant while Mrs. Green conducted meetings with E-Rate vendors exactly corresponds
9  with Judy Green's declaration which filed under seal in support of Allan Green's severance
10 motion.
11     C.    Government Witness Erik Plesset
12      According to Mr. Plesset, "at the October 9th meeting [2002, at the ADJ office], I met
13 Alan Green, Judy's husband. He was a nice man that seemed to be like a secretary to Judy and
14 did whatever she said, mailing things, traveling with her and carrying her bags etc."
15      In an earlier statement to the F.B.I., Plesset indicated, "[Judy] Green completed the FCC
16 form 470 and 471. She would prepare the E-Rate bids on the 470 forms and she would change
17 prices which Derosset and Plesset had created for the costs of goods and services . . . Green
18 completed the 470s in such a way to assure the companies associated with she and [co-defendant]
19 Newton would be able to get the contracts." Plesset went on to allege that "[Judy] Green and
20 [co-defendant] Newton set up foundations to come up with the ten percent for school districts
21 that have little money," and that "Green had all the companies, such as DCC and Sema4, provide
22 her with ten percent and she would put this money into the foundation." Mr. Plesset did not at all
23 mention Allan Green as participating in any of these activities.
24      During an interview with the government on May 25, 2006, Plesset told the prosecution
25 that Allan Green was present at meetings between ADJ Consultants and the vendors, but that
26 Allan Green was Judy Green's "puppet." Plesset further noted that "Alan did what [Judy] Green
27 directed him to do." While Plesset was at meetings at ADJ, "Alan was present for a while.
28 During the time Allan was there, he sent out federal express packages to schools."

D. Government Witness Gordon Taylor

Taylor was interviewed by the F.B.I. on December 22, 2004. During this interview he told the agents that Allan Green was present during a "pre-bid" meeting at the ADJ offices, in January of 2003 (people form Digital Connect and Expedition were also present). However, Taylor said that Allan "was not doing anything except sitting around the office."

When he was again interviewed by the government in May of 2006, Gordon Taylor told the government that "he did not think that Alan [Green] was that heavily involved." Regarding Allan Green's participation in the meetings between ADJ Consultants and the E-Rate vendors, Taylor noted that "Alan was always in the background, and at meetings the most he did was get the sandwiches." Mr. Taylor further noted that he understood Allan Green's role in contacting school districts was as "more of a messenger for Judy Green."

Taylor was interviewed by defense investigator Oasa on March 18, 2006. [Attached hereto as Exhibit A] During this interview Taylor indicated Judy Green controlled the E-Rate projects and "did all the talking." According to Taylor, Allan Green "was not knowledgeable enough" about E-Rate to be of any assistance with the projects. Allan, Taylor indicated, did not participate in discussions at any meetings. Instead, Allan, "got lunch," and "sat there." He said his conversations with Allan primarily involved "small talk, chit chat."

Taylor was re-interviewed by Oasa on February 10, 2007. [Attached hereto as Exhibit B] During this interview Taylor again recalled that "Allan got lunch, which was important." When asked by the investigator to describe Allan's role, Taylor replied, "I don't know, spouse and gopher?" Taylor then further explained, "Allan was hanging around, like wallpaper." Taylor said he observed Allan answer the phones and take messages, or hand the phone to Judy or Plesset. Taylor concluded, "Allan was an assistant, like a clerical person." He also indicated that Allan had contact with school districts, but that these contacts involved "picking up and dropping off stuff," as well as "making calls" to schools to pass on messages from Judy.

E. Government Witness Alan Derossett

Derosset was interviewed on February 9, 2007 [Attached hereto as Exhibit C] by defense investigator Ed Oasa. Derosset discussed his involvement in the Luther Burbank project, and his

*GREEN: Sentencing Memo*                                      8

interactions with Plesset, Newton, and Judy and Allan Green.

Regarding Allan Green, Derosset told the investigator, "Allan was around the [ADJ] office, coming and going." Derosset said that Allan's role seemed to him to be "fetching water and coffee for people, Allan was always there for lunch." Derosset's overall impression of Allan was that "he was just there to support his wife." Derosset also recalled Allan "singing a lot" to the opera music that the Greens liked to play at the ADJ office.

Derosset did not recall any conversation with Allan on the substantive aspects of any E-Rate project. Derosset said, "I don't recall ever asking him a question." His conversations about technical issues were with Judy Green, Plesset, and, less often, Newton.

## II.   THE APPLICABLE SENTENCING FACTORS.

Under *United States v. Booker*, the courts must treat the guidelines as just one of a number of sentencing factors set forth in the still valid portions of Sentencing Act (18 U.S.C. § 3553), and all sentences will be reviewed for "reasonableness," rather than compliance with the Guidelines.  See *Booker* at 803-04 ("Without the "mandatory" provision, the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals.  See 18 U.S.C. A. § 3553 . . . Section 3553 . . . sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.")  Since *Booker,* these factors are all appropriate sentencing concerns, of which the guidelines sentencing range is only one part.

As the Supreme Court recently noted,

> after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable ... He must make an individualized assessment based on the facts presented.

*Gall v. United States*, __ U.S. __, 128 S.Ct. 586, 596-97 (2007).

The Sentencing Act, which now guides federal judges in their selection of a sentence, directs the courts to "impose a sentence sufficient, but not greater than necessary, to comply . . . with the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

*See* 18 U.S.C. § 3553(a)(2). Section 3553(a) further directs sentencing courts to consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established for the offense under the Guidelines; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. Thus, the Guidelines range for the offense is but one of ten factors specified under The Sentencing Act.

The section 371 conspiracy offense to which Mr. Green plead guilty is a class D felony. See 18 U.S.C. § 371, 18 U.S.C. § 3559(a)(4). Mr. Green is therefor eligible for probation. See 18 U.S.C. 3561.

III.   APPLICATION OF THE SECTION 3553 STANDARDS TO MR. GREEN'S CASE CALLS FOR A PROBATIONARY OR "SPLIT" SENTENCE.

In accordance with *Booker, Gall,* and the directives of 18 U.S.C. § 3553(a), Mr. Green submits the following concerning the Court's consideration of an appropriate disposition of Mr. Green's case.

A.   <u>The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Green</u>.

As the above history demonstrates, Mr. Green had, until his involvement in the E-Rate matter, lived and entirely law abiding life. He had never before been arrested for any criminal offense. His criminal conduct here simply cannot be fairly assessed without reference to his background.

Mr. Green spent his adult life gainfully employed, including working for many years in the public schools, first as a teacher and later as a counselor and administrator at Cooper High

School in San Pedro, California. Clearly, financial gain has never been one of Mr. Green's primary concerns in life.

Mr. Green has also continued his education throughout his career in the public school system, despite the fact such continuing education did not further his financial interests (Mr. Green completed his Masters degree and obtained his teaching credential when he was 26, in 1972). In order to assure he would continue to be fully and adequately prepared for his various jobs int hew schools, Mr. Green continued, throughout his career, to take specialized educational programs in the areas of education, school administration, and counseling.

Mr. Green's involvement in the charged offenses consisted of acting as his wife's administrative assistant. He was not at all involved in the planning or organizing aspects of the conspiracy, and was not paid at all. Mr. Green does not know how much money his wife made as a result of her activities. However, he believes nearly all of the income she did realize she lost gambling.[3] Prior to their arrest, the Greens lived quite modestly and well within the lifestyle one would expect for two retirees from public school systems. Since his arrest, Mr. Green has returned to working and maintained steady employment as an "inspector" for a company that markets rebates for energy efficient appliances and building systems. Mr. Green now makes aproximately $400/week, and he lives paycheck to paycheck. He and his wife have lost their home to forfeiture and they live in a condominium apartment rented from a friend. Since their arrest in this matter they have gone through bankruptcy proceedings in addition to losing their home.

In sum, Mr. Green is hardly the typical fraud defendant in that he has never shown any interest in wealth, and has instead chosen to toil in a public-service oriented career that provided him very modest financial rewards. Moreover, even though he did participate in his wife's fraud scheme, he did not do so in order to make money. He involved himself only in order to support his wife, who repeatedly told him that her activities fell within accepted business practices and that she was doing a great deal to help poor school districts obtain valuable grants. He has

---

[3] Mr. Green believes his wife suffers from several psychiatric disturbances, including manic depression, chronic abuse of psychotropic medication, and compulsive gambling.

*GREEN: Sentencing Memo*                                   11

candidly and ruefully admitted that he knew that the foundation he discussed with officials at the Philadelphia Academy did not have funding to pay for the schools required co-payment, and that misrepresentation is the basis for his guilty plea.

    B.    <u>The Need for the Sentence Imposed to Satisfy Certain Articulated Purposes</u>.

        **1**.    **To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**.

Though the charged crime in the present case is a felony, it is, compared to many other Federal offenses, not particularly serious. This is not to minimize the defendant's criminal behavior in the present case but merely to put in perspective. This offense involves conduct where the only victim was the federal government, and the government suffered no actual loss because the Philadelphia Academy's E-Rate application was denied.[4] Although the guidelines call for a "loss" figure of $200,000-$400,000 (because this is the amount that of the contemplated funding of Philadelphia academy), in fact <u>*there was no monetary loss at all because the application for funding was denied*</u>.

        **2**.    **To Afford Adequate Deterrence to Criminal Conduct.**

Mr. Green submits that a term of probation with 60 days community confinement followed by 6 months of home detention would be more than sufficient to deter him from committing any new offenses.

Mr. Green committed his first criminal offense at age 59. Moreover, Mr. Green became involved in the fraud scheme at the direction of his wife, who will be in prison for the next seven and a half years (until Mr. Green is 71). Given Mr. Green's age and the fact he will be separated from his wife, who instigated Mr. Green's criminal conduct, there is little chance Mr. Green will re-offend.

U.S. probation has concluded, "it is anticipated that the consequences [Mr. Green] has endured and will continue to endure will deter him from any future criminal conduct." PSR at Sentencing Recommendation, p.2. We ask the Court to consider that Mr. Green now has a

---

    [4] As Mr. Green noted above, he only became involved in the E-Rate business at the very end of the conspiracy. By that time federal agents and auditors were already aware of abusive practices in the program, so when the Philadelphia Academy application was submitted it was quickly denied, as were all of the other "year six" applications prepared by ADJ Consulting.

*GREEN: Sentencing Memo*         12

felony conviction which will make it very difficult, especially at his age, to get hired. The requested sentence will permit him to keep his current employment - which is an enormously important thing at this point in his life. Under the circumstances probation, community confinement and home detention are more than adequate to deter future criminal conduct.

### 3. To Protect the Public from Further Crimes of Mr. Green.

Mr. Green simply shows no proclivity, much less opportunity, to commit any additional crimes. He is genuinely remorseful and ashamed that he accepted his wife's representations that her conduct of ADJ Consulting was within the realm of accepted business practices. Mr. Green posses no threat to the public.

The extent of Mr. Green's contrition is perhaps best exemplified by his decision to cooperate with the government even though it meant he would have to provide information to the government that would incriminate the woman to whom he has been married for the past forty years. Mr. Green's decision to cooperate in a manner that he knew would harm his wife caused him great distress, and he cooperated only because he now fully understands that the way in which his wife conducted her E-Rate consulting business was improper and unlawful.

Moreover, Mr. Green's conduct - at age 59 playing a minor role in a scheme to defraud a government entitled project, which scheme was orchestrated by his wife who will be in prison for the next seven years - poses no ongoing threat to public safety, so the need to protect the public from additional such crimes is not compelling.

### 4. To Provide Mr. Green with Needed Educational and Vocational Training, and Correctional Treatment.

Mr. Green has a Masters degree in education, various teaching and public administration certificates, and a long history of work in the public schools. He does not require further vocational training or education.

However, Mr. Green and his wife are, as a result of their convictions, in a precarious financial situation. Mr. Green will not be able to get employment at a public school following this conviction. He and his wife have declared bankruptcy and have been living at a friend's second home that is currently listed for sale. In order to assure that he has a place to live, Mr. Green must continue working. If he is imprisoned for a significant period of time when his wife

is also in prison, Mr. Green may not be able to continue to maintain a home for himself, or for his wife when she is released.

### C. The Kinds of Sentences Available.

The Sentencing Act allows for a term of imprisonment or a probationary sentence of up to five years on a conviction of this section 371 offense. See 18 U.S.C. section 3561(C). The Guidelines set the appropriate punishment for this type of offense as imprisonment. See U.S.S.G. § 5C1.1(f). However, Mr. Green asserts that his case lacks many of the characteristics present in federal offenses which result in prison sentences. Moreover, now that the Sentencing Act controls, rather than the Guidelines, Mr. Green is eligible for probation or community confinement, or a "split sentence" including both community confinement and imprisonment.

In *Booker*, the Supreme Court severed and excised 18 U.S.C. section 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guidelines range. *Booker*, 125 S. Ct. at 756. This renders the sentencing guidelines advisory. *Id.* 18 U.S.C. sections 3551, 3559, 3561, 3571, and 3581 now control the types of available sentences based upon a defendant's conviction.

Since the guidelines are now only advisory, the sentencing table and the restrictions on probationary sentences, sentences of home confinement, and split sentences in U.S.S.G. § 5A, 5B1, and 5C1 are also advisory. Thus, to receive a sentence of probation, the defendant does not have to come within Zones A or B, and to receive a split sentence the defendant does not have to come within Zone C. Accordingly, Mr. Green is eligible for such alternative sentences, even if the Court decides Mr. Green's guidelines range falls within Zone C or D. See, e.g., *United States v. Chettiar*, 501 F.3d 854 (8th Cir. 2007)(approving a split sentence including time in a halfway house and home detention where "the district court applied the substitution options available in Zone B to a level thirteen offense by shifting the sentencing table's Zone B overlay upward three levels."); *United States v. Kononchuk*, 485 F.3d 199 (3rd Cir. 2007)(holding that "under *Booker*, the Guidelines' disallowance of the option of probation is, of course, merely advisory," and noting that a district court may choose "not to follow the advisory provisions of Zone D of the Guidelines sentencing table ...").

In the Los Angeles Area where Mr. Green lives and works there are many community confinement facilities, and U.S. Probation is funded and has contracted for numerous spaces in these community confinement facilities. Although there is often a waiting list for these spaces, if a defendant is sentenced to such a facility, as opposed to seeking voluntary admission, the sentenced defendant takes priority over those seeking optional admission.

> D. The Kinds of Sentence and the Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the Guidelines.

Mr. Green submits that his guidelines range should be calculated as follows:

- Adjusted offense level of 18 (USSG § 2X1.1(c)(1), 2B1.1(b)(1)(G))

- Minus Two Levels for Minor Role (USSG § 3B1.2)

- Minus Three Levels for Acceptance (USSG § 3E1.1)

- Minus Two Levels for Departure for cooperation with the Government (USSG § 5K1.1)

- Total Offense Level = 11

The guidelines range for a level 11 offense, with a criminal history score of 0 (category I) is 8 to 14 months imprisonment, in Zone C of the sentencing table.

U.S. Probation has concluded that Mr. Green should not receive any adjustment for role in the offense. See PSR at ¶ 30, Addendum ¶ 3. The probation officer asserts Mr. Green should not receive a minor role adjustment because his plea agreement only involved the Philadelphia Academy charge, not the larger conspiracy, and Mr. Green played a more active role in the Philadelphia Academy E-Rate scheme. See PSR at Addendum ¶ 3. Mr. Green asserts U.S. Probation's recommendation is based on a mistaken belief Mr. Green "took control of the Philadelphia Academy's E-Rate process." See *id.*

In fact, as Brien Gardiner's testimony at the trial of Judy Green, Judy Green's declaration, and the statements of all of the government's witnesses concerning the "year six" E-Rate applications show, Allan Green did not play a major role in Philadelphia Academy's E-Rate application. Instead, Mr. Green was sent by Judy to make initial contact with Philadelphia Academy and to make a sales pitch. Thereafter he simply accompanied his wife to several meetings with the Philadelphia Academy staff. At the meetings Judy Green "indicated she could

help [Philadelphia Academy obtain E-Rate funding] and pretty much do it from inception, from beginning to end, the whole process." In contrast, Allan Green's knowledge of the process was so limited that he had to call his wife in response to a question from Mr. Gardiner, to find out the name of Judy Green's consulting business for this particular E-Rate application.

In sum, Mr. Green's involvement in the Philadelphia Academy's E-Rate application consisted of attending an introductory meeting with the staff at which Mr. Green informed the staff that his wife could help them obtain E-Rate funding. From that point forward, Judy Green completely controlled the process, as she did in the case of all of the other "year six" applications. Mr. Green's conduct therefor warrants a minor role adjustment.

In addition, Mr. Green cooperated with the government, and against his wife, and the Government has made a motion for a departure from the applicable Guidelines range pursuant to Guidelines § 5K1.1. As a result of Mr. Green's cooperation, the government has recommended a departure equivalent to a two-level reduction in Mr. Green's offense level. If the Court were to adopt the government's recommended two-level departure, and find Mr. Green played a minor role in the offense, the resulting offense level would be 11. Given Mr. Green's Category I criminal history, an offense level of 11 would result in a Guidelines range of 8 to 14 months, in Zone C of the sentencing table. Of course, the court could also reach a level 11 (without Minor Role adjustment) by deciding to depart 4 levels, rather than the 2 levels the government seeks. See, e.g., *United States v. Hanna*, 49 F.3d 572, 576 (9th Cir. 1995)(noting that a district court's decision as to the extent of a 5K1.1 departure is entirely discretionary). With a Minor Role adjustment, a four level departure would result in an offense level of 9 (Zone B, 4-10 months).

Finally, the adjusted offense level in this case is based on a "loss" figure of $200,000 to $400,000. Although this is the correct and agreed upon loss figure under the Guidelines (because it is the amount that would have been awarded to Philadelphia Academy if the application was granted), in fact, the application was denied and there was no actual loss whatever. Mr. Green respectfully suggests that the Court should adjust it's sentencing decision downward to account for this obviously important fact.

E.   Pertinent Policy Statements Issued by the Sentencing Commission.

Application Note 1(b) for Guidelines section 5B1.1, which concerns imposition of a term of probation, directs that when the Court chooses to place a defendant facing more than one year of imprisonment on probation, the term of probation should include a period in home detention or community confinement. Mr. Green agrees that a period of community confinement, with work release, followed by home detention, would be appropriate in his case.

Similarly, Application Note 6 for Guidelines section 5C1.1 (concerning terms of imprisonment) suggests, "there may be cases in which a departure from the guidelines by substitution of a longer period of community confinement than otherwise authorized for an equivalent number of months of imprisonment is warranted to accomplish a specific treatment purpose." Mr. Green therefor submits that should the Court choose to deny probation and impose a term of imprisonment, his would be an appropriate case for shortening the term of imprisonment and adding community confinement to his supervised release because of his age, his lack of prior criminal history, his good employment history, and his relatively minor role in the offense.

F.   The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.

Earl Nelson, another lesser defendant who participated in only a few of the fraudulent E-Rate applications at issue in this case, was recently sentenced to a term of two years of probation, including terms of one month in a halfway house and with five months of home detention. Mr. Green asserts his conduct is no more serious than that of Mr. Nelson and warrants a sentence similar to Mr. Nelson's.

Mr. Nelson, like Mr. Green, is unusually old for a first time offender and had previously lived an entirely law abiding life. Also like Mr. Green, Mr. Nelson showed genuine contrition for his role the fraud scheme and posed little threat of re-offending. In sum, all of the factors that warranted a probationary sentence for Mr. Nelson weigh in favor of a similar sentence for Mr Green.

G.   The Need to Provide Restitution to Any Victims of the Offense.

The federal government is the victim in this offense, and there was no actual loss.

## CONCLUSION

Given all the factors discussed in this Memorandum, Mr. Green respectfully submits that a sentence of a term of 3 years of probation, with a condition requiring a 60 day term of community confinement, to be followed by 180 days home detention, is the appropriate disposition of this case. Such a sentence would address the sentencing factors listed in section 3553, would allow for Mr. Green to continue working and to maintain a home for himself and his wife, and would take into account his role in this offense vis á vis his wife, and his long public service to the community through his career in public education.

Dated: April 2, 2008.                                              Respectfully submitted,


_____
MARK ROSENBUSH
Attorney for Defendant
ALLAN GREEN

*GREEN: Sentencing Memo*                               18